Ferris SKAFF and Elizabeth Skaff, Appellees,

v.

SIOUX CITY, a Municipal Corporation, Appellant.

No. 53161.

Supreme Court of Iowa.

June 10, 1969.

Donald W. Sylvester, Asst. City Atty., Sioux City, for appellant.

George F. Davis, of Sifford, Wadden & Davis, Sioux City, for appellees.

SNELL, Justice.

Plaintiffs in a law action claimed damages from defendant city alleging unreasonable delay in the prosecution of eminent domain proceedings to acquire plaintiffs' business property and for interference with their use of the property while the proceedings were pending.

The city denied the material allegations of the petition. Affirmative defenses originally pleaded are not argued on appeal.

The trial court found the city as condemnor had not in good faith diligently instituted and prosecuted the eminent domain proceedings, and that the delay was unreasonable giving rise to this collateral action for consequential damages. The court further found the city had obstructed access to plaintiffs' property to their damage. The court rendered judgment for plaintiffs and against the city. The city appealed.

The only question presented by the appellant is the sufficiency of the evidence to support the findings of the trial court.

Plaintiffs owned a lot in Sioux City with a 40 foot frontage on Fourth Street and a 150 foot frontage on Steuben Street entirely covered by a one-story well constructed brick and tile building. There were sidewalks around the building on the street sides and the streets were paved.

On the Fourth Street side (south) there was a double door with an opening of five

feet. On the Steuben Street side (west) there was a walk in door and a 12' x 12' overhead door which allowed trucks to drive up to and into the building from Steuben Street.

On the north end of the building (back) there was a door facing an alley and a railroad spur track for loading and unloading box cars.

The building had been leased to a distributor of refrigeration equipment since January of 1948 at a rental of $300 per month.

Plaintiffs also owned a building and 5 lots on the west side of Steuben Street occupied by the Guarantee Roofing Company that are not the subject of this action.

For years the Floyd River flowing through the city had been a perennial source of trouble and damage at flood time. Corrective measures were discussed and developed and became known as Floyd Flood Control Project. At about the same time an urban renewal project was planned for adjacent property.

In late 1960 plaintiffs were advised that both of their properties were located within Floyd River Flood Control Project involving the relocation of the Floyd River.

The "take line" for the Flood Control Project included within its boundaries 403 square feet of plaintiffs' property here involved and all of their property on the west side of Steuben Street.

During the fall of 1960 and January of 1961 the city negotiated with plaintiffs concerning acquisition of both of the properties.

The taking of the property by the city appeared imminent.

The tenant renting the property here involved moved out and relocated. Plaintiffs' property across the street was taken by the city in January 1962. From 1961 until April 1965 the 403 square feet of plaintiffs' building here involved were in the Floyd Control Project. The taking of that part would require the razing of the building.

For the financial convenience of the city (substantial federal aid was involved) the construction work on the flood control project worked around plaintiffs' property and the property was not taken until April 1965 when Urban Renewal funds were available.

In the meantime plaintiffs were able to rent their building for only a short period of time and at a reduced rental. Taxes at the rate of $1100 per year continued.

The chronology of events illustrates the situation.

Late 1960—the owners were advised that this property was within the flood control project.

Fall of 1960 & January of 1961—city negotiated with these owners for acquisition of this property.

February 1961—tenant moves out and relocates.

April 1961—city holds public meeting attended by residents and business owners in area to discuss boundaries of both projects.

May 1961—city knows a portion of the property will be included in the urban renewal project if the federal funds eventually became available.

August 1961—final designation of take line for flood control project made by Army Engineers including 403 square feet of the property.

January 1962—city condemned other property of appellees adjacent to this one for use in flood control project.

April 1962—in connection with the flood control project the city began excavation work for a bridge on an abutting street. Pavement on both streets adjacent to this property was torn up and utilities disconnected. The railroad spur to the loading dock at the back of the

building was terminated. Access to the building and use of it was impossible.

The exhibits clearly show the conditions.

November 1962—Fourth Street (front of building) reopened to traffic.

February 1963—Fourth Street became usable to the owners, Steuben Street that had been adjacent to the side of the building never did. The door on that side and the north (back of the building) could not be used. The utility lines to the building had not been reconnected.

February 25, 1963—owner inquires of city as to its present intentions having received some information the city was not going to condemn the building.

March 4, 1963—city replies it is still going to acquire the property, admits part of it is already in flood control project, but prefers to finance the acquisition out of urban renewal funds.

March 1963—before renting the property the owners had to restore the utilities at their own expense after first getting the consent of the city.

March 1963—owners lease building at reduced rate of rent.

May 1963—city forbids owners and their tenants from driving off Fourth Street to the front door, the only remaining door of the 4 original ones, unless they limit the weight of the trucks and indemnify the city for damages that might be done to the sidewalk.

October 4, 1963—city advises owners that procedures to acquire the title to the property would commence in January of 1964.

April 1965—city acquires title to property from the owners under threat of condemnation.

The trial court found:

"1. The evidence offered herein by both of the parties sustains and establishes each and every material allegation of plaintiffs' petition as amended.

"2. Late in 1960 and early in 1961, the defendant city announced that the property in question was going to be taken by the city through Eminent Domain Proceedings as part of the Floyd River Control Project, the final decision as to including it in that project being made in August of 1961.

"3. Though adjacent property was condemned in connection with this project in January of 1962, no proceedings for acquisition of the property in question were then commenced.

"4. During 1962, the defendant city did appropriate and use the property in question in connection with said project.

"5. On April 1, 1965, the defendant city consummated Eminent Domain proceedings to take title to the property in question, these proceedings being in connection with and financed by another project.

"6. There was lack of good faith on the part of the city in instituting the action and there was no diligent prosecution thereof.

"7. The delay in the prosecution of the proceedings was unreasonable and the plaintiffs did not acquiesce therein.

"8. During the period from August 24, 1961, until the date of the actual condemnation on April 1, 1965, the city obstructed the access to said property for long periods of time.

"9. By reason of the unreasonable delay of the city in the prosecution of the proceedings by eminent domain and the denial of access to it plaintiffs were unable to use their property and suffered a loss of rental income in the sum of $9,975.00."

I. As noted, supra, the only question presented on this appeal is the sufficiency of the evidence to support the trial court's findings.

For the financial convenience of the city the officials may have had reasons

for preferring to finance the taking of plaintiffs' property from urban renewal rather than flood control funds. The fact remains, however, the taking of plaintiffs' property was a necessary part of the flood control project. The findings by the trial court that the delay was unreasonable and the access obstructed for long periods of time are amply supported by the record.

II. This law action is reviewable only on the errors assigned. The trial court's findings of fact have the standing of a special verdict and if supported by substantial evidence will not be disturbed. Marean v. Petersen, 259 Iowa 557, 562, 144 N.W.2d 906, 909, and Henneman v. McCalla, 260 Iowa 60, 148 N.W.2d 447, 450.

III. Appellant cites 1967 Utah Law Review 548. This is an excellent article on "Condemnor's Liability in Eminent Domain", but is not too helpful to appellant. We quote excerpts therefrom:

"Often before a project is actually begun, it is presented to the public by way of either official or unofficial announcement. Once it is known that a project is planned, tenants may move out; the land may become unsalable; maintenance of land and buildings may cease; ordinances preventing new construction may be passed; police protection may cease thereby encouraging vandalism. Any or all of the above could cause a general blight over the area, forcing values down and facilitating building deterioration. * * *

"A practice somewhat related to bad faith is the unreasonable protraction of condemnation proceedings or abandonment thereof after an extended period of time. Although a condemnor may have valid reasons for delay, the courts, upon a finding of unreasonableness, have required compensation for resulting damages. * * *

"When a governmental body has so interfered with property that its owner can no longer enjoy its use, the courts have held that the land—even absent an intent to condemn—has been 'taken' in the constitutional sense. * * * *"

When the streets and alley abutting plaintiffs' property were torn up and closed to traffic and future condemnation had been announced there was a "taking" of the property for all practical purposes. When beneficial use of property is destroyed a property right has been taken. This was before the taking by transfer of title. There is no claim that plaintiffs' damage merged in the sum ultimately paid for the property. A taking by destruction of access is compensable. Nalon v. City of Sioux City, 216 Iowa 1041, 250 N.W. 166; Graham v. City of Sioux City, 219 Iowa 594, 596, 258 N.W. 902; Edmond v. Sioux City, 225 Iowa 1058, 283 N.W. 260; Iowa State Highway Commission v. Smith, 248 Iowa 869, 82 N.W.2d 755, 73 A.L.R.2d 680.

IV. There was evidence that plaintiffs lost 4 years, 1 month and 15 days rental at $300 per month or a total of $14,850.00. Plaintiffs recovered $4,875 as rental at $195. per month for 2 years and 1 month. Plaintiffs lost income was $9,975.

It appears without dispute that delay in final consummation of defendant's programs caused loss to plaintiffs.

The city tacitly admits delay but offers the ponderous procedures involved as an excuse. We quote from appellant's brief:

"The decisions made by City officials in connection with both the Flood Control Project and the Urban Renewal Project were made in conjunction with and subject to the rules and regulations as established by the Federal Government and such decisions were made in good faith and for the best interests of all the parties concerned. * * *

"Any work that the City might have done in connection with the Urban Renewal Project prior to April of 1964 was preliminary to and in anticipation of the fact that the Federal Government might choose to finance the project. Because of Federal regulations, it is necessary to make advanced studies and plannings which might result in anxiety amongst the various prop-

erty owners that might be affected. This anxiety is not the fault of the City, but it is, if anything, a necessary evil that must be lived with if the City of Sioux City or any other city is going to successfully undertake any federally funded urban renewal project. * * *"

■ The thrust of this argument is parried when it is remembered that plaintiffs' property from the beginning was involved in the Flood Control Project and was only shifted to Urban Renewal for convenience in payment. A change from one project to another for the benefit of the city should not relieve the city from its obligations to plaintiffs.

V. Both sides cite Graham v. City of Sioux City, supra. The Graham case quotes from McQuillin, Municipal Corporations. The case and quoted authority consider the question of consequential damage incident to unreasonably long restriction of access. From the premise of that case the city argues that there was no unreasonable delay and no liability. The trial court found adversely to defendant and the record supports the finding.

The case is

Affirmed.

All Justices concur, except RAWLINGS, J., who takes no part.