Belknap
No. 98-257

ROBERT M. AND VIRGINIA V. BERGERON

v.

STATE FARM FIRE AND CASUALTY COMPANY

November 15, 2000

*Forman & Bernier, P.A.*, of Londonderry (*Gary H. Bernier* on the brief and orally), for the plaintiffs.

*Scotch & Zalinsky*, of Manchester (*Barry M. Scotch* on the brief and orally), for the defendant.

DALIANIS, J. The plaintiffs, Robert M. and Virginia V. Bergeron, appeal the Superior Court's (*Smukler*, J.) denial of their petition for declaratory judgment, *see* RSA 491:22 (1997), to establish coverage under a homeowners insurance policy (policy) issued by the defendant, State Farm Fire and Casualty Company, for damages sustained as a result of a dam's failure on their property. We affirm.

The following facts were adduced at the hearing. In 1992, the plaintiffs purchased property in Alton, which consisted of a barn foundation, septic system, thirty-three acre pond, and a dam that impounded the pond. The plaintiffs reconstructed the dam. They also purchased a builder's risk policy from the defendant that was later converted into a homeowners policy upon the substantial completion of their home. This policy was in effect on the date of the incident.

On March 13, 1996, the Bergerons' dam collapsed. Several engineering firms investigated the dam's failure and concluded that it failed because of "piping." Piping is the migration of the materials of which the dam is constructed, which creates an open flow, or pipe, within the dam. The dam's design and construction caused it to be susceptible to piping.

The plaintiffs brought a petition for declaratory judgment to determine whether their policy covered the dam's failure. They contended that there was coverage because the dam was a "building" which "collapsed" either from: (1) an "explosion" of part of the dam; or (2) "hidden decay." Each alternative would entitle the plaintiffs to recover under the policy. The trial court found that the defendant had met its burden of proving, *see* RSA 491:22-a (1997), that the policy did not cover the incident because the dam was not a "building" nor was its failure caused by an "explosion" or by "hidden decay."

On appeal, the plaintiffs contend that the trial court erred by: (1) construing certain undefined terms in the policy, including "explosion," "building," and "hidden decay"; (2) failing to find coverage under the "any resulting loss" section of the policy; and (3) admitting the presentation and related testimony of the defendant's expert regarding whether an "explosion" occurred.

"The interpretation of an insurance policy is a question of law for this court to decide." *Bianco Prof. Assoc. v. Home Ins. Co.*, 144 N.H. 288, 292, 740 A.2d 1051, 1055 (1999). "In interpreting an insurance policy, we take the plain and ordinary meaning of the policy's words in context, and we construe the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole." *Federal Bake Shop v. Farmington Cas. Co.*, 144 N.H. 40, 42, 736 A.2d 459, 460 (1999) (quotation omitted).

Our analysis of the policy begins with **SECTION I — COVERAGES**, which states:

> **Dwelling Extension.** We cover other structures on the **residence premises**, separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line, or similar connection are considered to be other structures.

The parties agree that the dam constitutes an "other structure" under the policy. **SECTION I — LOSSES INSURED, COVERAGE A — DWELLING**, states that the defendant will provide coverage "for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I — LOSSES NOT INSURED**." Therefore, the dam is covered by the policy unless coverage is withdrawn by the "losses not insured" section.

**SECTION I — LOSSES NOT INSURED** states, in pertinent part, that the defendant

> do[es] not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through m. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
>
> a. collapse, except as specifically provided in **SECTION I — ADDITIONAL COVERAGES**, Collapse;
>
> . . . .

The parties also agree that the dam collapsed. Thus, we turn to **SECTION I — ADDITIONAL COVERAGES**, Collapse, which provides that the defendant

insure[s] for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. perils described in **SECTION I — LOSSES INSURED, COVERAGE B - PERSONAL PROPERTY**. These perils apply to covered building and personal property for loss insured by this Additional Coverage;

b. hidden decay;

. . . .

**SECTION I — LOSSES INSURED, COVERAGE B — PERSONAL PROPERTY** provides that the defendant will insure "for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in **SECTION I — LOSSES NOT INSURED: . . . Explosion**." Thus, the plaintiffs conclude that the combination of these sections provides coverage for the dam's collapse because the dam is a "building," and its "collapse" was caused either by an "explosion" or by "hidden decay."

The plaintiffs first contend that the trial court erred in concluding that a reasonable reading of the term "building" did not include the dam. Alternatively, they contend that it is at least ambiguous as to whether the term "building" includes the dam and therefore the policy should be construed in favor of coverage. We disagree that a reasonable reading of the term "building" clearly encompasses the dam, see 1 M. RHODES, COUCH ON INSURANCE 2D § 6:7 (rev. ed. 1984) ("[a] 'building' is defined as a 'fabric or edifice, framed or constructed, designed to stand more or less permanently and covering a space of land for use as a dwelling, storehouse, a factory, shelter, etc.'"), and turn instead to the question of whether the term "building" as used in the policy is ambiguous.

We have previously stated that "[i]f the language of a policy is reasonably susceptible to more than one interpretation and one interpretation favors coverage, the policy will be construed in favor of the insured and against the insurer." *Hudson v. Farm Family Mut. Ins. Co.*, 142 N.H. 144, 146, 697 A.2d 501, 503 (1997). "We will not, however, perform amazing feats of linguistic gymnastics to find a term ambiguous." *Federal Bake Shop*, 144 N.H. at 42, 736 A.2d at 460 (quotation omitted).

The plaintiffs submitted two dictionaries into evidence, which defined the term "building" respectively as a "permanent fixed structure," THE OXFORD DESK DICTIONARY 76 (American ed.

1995), and as a "structure; edifice," THE AMERICAN HERITAGE DICTIONARY 114 (3d ed. 1992). The trial court used a third dictionary to obtain a narrower definition of "building." We also found the following definition:

> [A] constructed edifice designed to stand more or less permanently, covering a space of land, usu[ally] covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure — distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy . . . .

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 292 (unabridged ed. 1961). While the range of definitions of the term "building" causes us again to question the usefulness of dictionaries in interpreting terms, *see, e.g., Hudson,* 142 N.H. at 146, 697 A.2d at 503, we agree with the trial court that the broad interpretation of "building" urged by the plaintiffs is not reasonable given the context of the term in the policy.

Almost every time the word "building" appears, its context requires that the term mean something more than anything that is built. For example "building" appears as part of the definition of residence premises ("that part of any other building . . . where you reside"), in the section dealing with coverage from volcanic action (covering loss to a "building or covered property contained in a building"), in the section covering personal property damaged by a windstorm or hail ("does not include loss to property contained in a building" and includes coverage of loss to watercraft "while inside a fully enclosed building"), in the section covering losses caused by falling objects ("does not include loss to property contained in a building unless the roof or an exterior wall of the building is first damaged"), in the coverage for breakage of glass ("meaning damage to personal property caused by breakage of glass which is a part of a building on the residence premises"), in the losses not insured section regarding loss caused by the freezing of a heating system ("maintain heat in the building"), and in the section covering certain losses caused by water ("cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance").

Thus, in context, the term "building," as used in the policy, does not include the dam. Therefore, the plaintiffs are not entitled

to coverage for the dam's collapse even if the collapse was due to an "explosion" or "hidden decay."

The plaintiffs next contend that the trial court erred when it failed to rule that "all losses" resulting from the dam's defective design or construction are covered by the "any resulting loss" section of the policy. The plaintiffs, however, read the phrase "any resulting loss" out of context. Subsection three of **SECTION I — LOSSES NOT INSURED** provides in part that "[the defendant] do[es] not insure under any coverage for any loss consisting of one or more of the items below . . . b. defect, weakness, inadequacy, fault or unsoundness in: . . . (2) design, specifications, workmanship, construction, grading, compaction . . . ." At the end of this subsection is the following language: "However, we do insure for any resulting loss from items a. and b. *unless the resulting loss is itself a Loss Not Insured by this Section*." (Emphasis added.) Thus, not every loss resulting from a defect in design or construction is covered; only those losses that are not themselves excluded by the policy are covered.

■ **SECTION I — LOSSES NOT INSURED** states, in pertinent part, that the defendant

> do[es] not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events.
>
> . . . .
>
> b. **Earth Movement**, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow, sinkhole, subsidence and erosion.
>
> . . . .
>
> c. **Water Damage**, meaning:
>
> (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, all whether driven by wind or not;
>
> . . . .

At the declaratory judgment hearing, the defendant's claim representative testified that the defendant denied coverage for the resulting losses from the dam's failure because they were caused by

excluded events (earth movement and water damage). The trial court's failure to find coverage under the "any resulting loss" language, therefore, was not erroneous.

The plaintiffs' final contention is that the trial court erred in admitting a slide presentation and related testimony by the defendant's expert that involved the expert's opinion that the dam's failure was not caused by an explosion. We need not address this issue. The plaintiffs concede that any coverage under the policy for an explosion is dependent upon the term "building" including the dam. Having already determined that the dam was not a "building" under the policy, we need not address issues related to how the dam failed.

*Affirmed.*

JOHNSON, J., sat for oral argument but retired prior to the final vote; BROCK, C.J., and HORTON, BRODERICK, and NADEAU, JJ., concurred; NADEAU and DALIANIS, JJ., took part in the final vote by consent of the parties.